## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELECTRICAL WORKERS PENSION FUND, LOCAL 103, I.B.E.W., Individually and on Behalf of All Others Similarly Situated, | Civil Action No. |
| Plaintiff, | |
| v. | DEMAND FOR JURY TRIAL |
| DOUBLEVERIFY HOLDINGS, INC., MARK ZAGORSKI, and NICOLA ALLAIS, | <u>CLASS ACTION</u> |
| Defendants. | |

## CLASS ACTION COMPLAINT FOR VIOLATIONS
## <u>OF THE FEDERAL SECURITIES LAWS</u>

Plaintiff Electrical Workers Pension Fund, Local 103, I.B.E.W. (the "Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through counsel, which included, among other things, a review of the public U.S. Securities and Exchange Commission ("SEC") filings of DoubleVerify Holdings, Inc. ("DoubleVerify" or the "Company"), Company press releases, conference call transcripts, investor presentations, analyst and media reports, and other public reports and information regarding the Company.  Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein, which evidence will be developed after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired DoubleVerify common stock between November 10, 2023 and February 27, 2025, inclusive (the "Class Period").  Plaintiff brings this action seeking to recover damages caused by Defendants' (defined herein) violations of the federal securities laws under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      DoubleVerify operates a software platform for digital media measurement and advertising optimization services.  Founded in 2008, DoubleVerify began with a focus on measuring the quality and performance of digital ads after they are purchased and deployed by advertisers ("Measurement Services").  The Company's Measurement Services provide advertisers with data on metrics such as viewability, fraud detection, brand safety, and suitability to help them verify whether their digital ads are viewed in a fraud-free, brand-suitable environment.  DoubleVerify has since expanded its core offerings to include advertising

optimization services, with a focus on using artificial intelligence ("AI") to drive desired digital ad placement outcomes for global brands ("Activation Services"). DoubleVerify's Activation Services have traditionally been geared toward ads purchased through programmatic auctions on open ad exchanges. The Activation Services that DoubleVerify provides to advertisers in connection with open ad exchanges are priced at a premium and generate substantially higher profit margins for DoubleVerify than its Measurement Services.

3.     Prior to the Class Period, advertisers began to experience a sharp increase in internet traffic from advertising impressions served to robotic agents ("bots") rather than to genuine human consumers. As generative AI technology improved, third parties began to generate seemingly authentic user agents with bots that could mimic billions of ad impressions being delivered to real users. The proliferation of generative AI became a key factor in the rapid evolution of invalid bot traffic schemes, making it easier for bad actors to falsify data patterns. Because DoubleVerify's technology could not adequately filter out this invalid bot traffic, the Company's Activation Services on open ad exchanges had become less useful to advertisers.

4.     These invalid traffic schemes have pushed many advertisers from placing their ads on open exchanges to closed platforms which include private marketplaces and other "walled gardens" operated by large technology companies such as Meta Platforms, Google, TikTok, and Amazon, where access to data is heavily restricted and expensive for third-party verification companies like DoubleVerify to integrate into its Activation Services. Leading up to the Class Period, this industry shift to closed platforms had already begun to negatively impact DoubleVerify's margins and profits.

5.    This complaint alleges that, throughout the Class Period, Defendants misled investors by failing to disclose that:

(a)    DoubleVerify's customers were shifting their ad spending from open exchanges to closed platforms, where the Company's technological capabilities were limited and competed directly with native tools provided by platforms like Meta Platforms and Amazon;

(b)    DoubleVerify's ability to monetize on its Activation Services was limited because the development of its technology for closed platforms was significantly more expensive and time-consuming than disclosed to investors;

(c)    DoubleVerify's Activation Services in connection with certain closed platforms would take several years to monetize;

(d)    DoubleVerify's competitors were better positioned to incorporate AI into their offerings on closed platforms, which impaired DoubleVerify's ability to compete effectively and adversely impacted the Company's profits;

(e)    DoubleVerify systematically overbilled its customers for ad impressions served to declared bots operating out of known data center server farms;

(f)    DoubleVerify's risk disclosures were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; and

(g)    as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading or lacked a reasonable basis.

6.    Investors began to learn the truth about this fraud on February 28, 2024, when DoubleVerify issued lower revenue growth expectations for the first quarter of 2024 due to "a slow start by brand advertisers and a slow ramp by recently signed new large customers." On this news,

DoubleVerify's stock price dropped $8.35 per share, or 21.3 percent to a closing price of $30.89 on February 29, 2024.

7.  On May 7, 2024, in connection with its first quarter 2024 earnings report, DoubleVerify surprised analysts by cutting its full-year 2024 revenue outlook due to customers that were pulling back on their ad spending.  On this news, DoubleVerify's stock price dropped $11.79 per share, or 38.6 percent to a closing price of $18.78 on May 8, 2024.

8.  Then, on February 27, 2025, when DoubleVerify reported lower-than-expected fourth quarter 2024 sales and earnings due in part to reduced customer spending.  Defendants also disclosed that the shift of ad dollars from open exchanges to closed platforms was negatively impacting the Company.  On this news, DoubleVerify's stock price fell approximately 36 percent to close at $13.90 on February 28, 2025.

9.  Finally, On March 28, 2025, market research company Adalytics Research, LLC ("Adalytics") released a report claiming that DoubleVerify's web advertisement verification and fraud protection services are ineffective, and that DoubleVerify customers are regularly billed for ad impressions served to declared bots operating out of known data center server farms.  On the same day, *The Wall Street Journal* reported that DoubleVerify regularly misses detection of nonhuman traffic in contradiction to the Company's claims that it helps brands avoid serving ads to nonhuman bot accounts.

10.  As a result of Defendants' wrongful acts and omissions, and the significant declines in the market value of the Company's common stock pursuant to the revelations of the fraud, Plaintiff and other members of the Class (defined herein) have suffered significant damages.

**JURISDICTION AND VENUE**

11.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (*see* 17 C.F.R. § 240.10b-5).

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  The Company's principal offices are located in this District.  Substantial acts in the furtherance of the alleged fraud or the effects of the fraud have occurred in this District.  Defendants' wrongful acts also arose in, emanated from, and caused harm in this District.  Such acts include the dissemination of false and misleading statements into this District.  Additionally, venue is proper in light of the purchase of the Company's stock by members of the Class who reside in this District.

14.    In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, the United States mail, interstate telephone communications, and the facilities of a national securities exchange, the New York Stock Exchange.

**PARTIES**

**A.    Plaintiff**

15.    Plaintiff purchased or otherwise acquired DoubleVerify common stock during the Class Period and was damaged as a result of the Defendants' wrongdoing alleged in this complaint.

**B.    Defendants**

16.    Defendant DoubleVerify is incorporated in Delaware and headquartered in New York, New York.  DoubleVerify stock trades on the New York Stock Exchange under the ticker symbol "DV."

17.    Defendant Mark Zagorski ("Zagorski") was at all relevant times DoubleVerify's Chief Executive Officer and served on DoubleVerify's Board of Directors.

18.    Defendant Nicola Allais ("Allais") was at all relevant times DoubleVerify's Chief Financial Officer.

19.    Defendants Zagorski and Allais are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of DoubleVerify's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from, the public, and that the positive representations which were being made were then materially false or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

**A.    Company Background**

20.    DoubleVerify provides data analytics services that help brands, agencies, and publishers verify that their digital advertising investments are delivered as intended.

21.    DoubleVerify generates revenue primarily through two categories of services: (1) Measurement Services; and (2) Activation Services.    Measurement Services provide advertisers with analytics to measure the effectiveness of their digital advertisements, including whether ads are delivered in brand-safe environments, are fully viewable, and reach real people in the intended geography.  The Company generates Measurement Services revenue from fees earned on a high volume of low-value transactions, which are highly automated and based on contractual terms with advertisers.

22.    DoubleVerify's Activation Services enable advertisers to optimize their campaigns by leveraging measurement data to drive desired ad placement outcomes for global brands.  These services include AI-powered optimization tools like Scibids AI, which optimizes campaign performance, and Authentic Brand Suitability ("ABS"), which helps advertisers avoid unsuitable content.  Activation Services revenue is generated from evaluating and purchasing ad inventory through programmatic demand-side platforms ("DSPs") like The Trade Desk, Inc. and social media platforms like TikTok and Instagram.  Customers pay the Company a fee for the successful execution of advertisement purchases.

23.    DoubleVerify's Measurement Services on platforms like Instagram are often a prerequisite for the use of optimization tools via DoubleVerify's Activation Services.  The Company's Measurement Services are often the entry point for customers, with Activation Services being upsold once measurement is in place.  For example, 70 percent of DoubleVerify's top 500 customers have adopted ABS, demonstrating the interconnected nature of these services.

The Company's Activation Services are priced at a premium and generate substantially higher profit margins than Measurement Services in connection with advertising placed through an open exchange.

24.    Prior to the Class Period, advertisers began to experience a sharp increase in internet traffic from advertising impressions served to bots rather than to humans.  The proliferation of generative AI became a key factor in the rapid evolution of invalid bot traffic schemes, making it easier for bad actors to falsify data patterns.  Because DoubleVerify's technology could not adequately filter out this invalid bot traffic, the Company's Activation Services on open ad exchanges had become less useful to advertisers.

25.    These invalid traffic schemes have pushed many advertisers from placing their ads on open exchanges to closed platforms, where access to data is heavily restricted and expensive for third-party verification companies like DoubleVerify to integrate into its Activation Services.  Leading up to the Class Period, this industry shift to closed platforms had already begun to negatively impact DoubleVerify's margins and profits.

**B.    Materially False and Misleading Statements Issued During the Class Period**

26.    The Class Period begins on November 10, 2023, the day after DoubleVerify issued a press release announcing its results for the third quarter ended September 30, 2023 (the "Q3 2023 Earnings Report").  In the Q3 2023 Earnings Report, DoubleVerify touted its "***recent customer wins as demand for our solutions rose across key digital media environments***."  The Q3 2023 Earnings Report also highlighted quarterly revenue of "***$144.0 Million Driven by Global Growth in Social, CTV Measurement and Programmatic Activation***."

27.    On the same day the Q3 2023 Earnings Report was issued, the Company filed with the SEC a Form 10-Q reporting the Company's financial results for the third quarter of 2023 (the "Q3 2023 10-Q").  In the Q3 2023 10-Q, the Company stated that "There have been no material

changes to the risk factors described in the section titled 'Risk Factors' in the Annual Report on Form 10-K for the year ended December 31, 2022 ("2022 10-K") and the Quarterly Report on Form 10-Q for the quarter ended March 31, 2023." The 2022 10-K contained the following risk factor concerning the ability of DoubleVerify to remain competitive:

> ***If we fail to respond to technological developments or evolving industry standards, our solutions may become obsolete or less competitive.***
>
> Our future success will depend in part on our ability to develop new solutions and modify or enhance our existing platform in order to meet customer needs, add functionality and address technological advancements. To remain competitive, ***we will need to continuously upgrade our existing platform and develop new solutions that address evolving technologies and standards across all major channels, formats and devices for digital advertising***, including mobile, social, video, in-app, display and connected television, as well as across digital media buying platforms, such as programmatic, direct ad exchanges and trading networks. We may be unsuccessful in upgrading our existing platform or identifying new solutions in a timely or cost-effective manner, or we may be limited in our ability to develop or market new or upgraded solutions due to patents held by others. In addition, any new product innovations may not achieve the market penetration or price levels necessary for profitability. ***If we are unable to develop timely enhancements to, and new features for, our existing platform or if we are unable to develop new solutions that align with advertiser demands as priorities shift or keep pace with rapid technological developments or changing industry standards, the solutions we deliver may become obsolete, less marketable and less competitive, and our business, financial condition and results of operations may be adversely affected***.

28.     The 2022 10-K also contained the following risk factor concerning the use of activation services in private platforms by DoubleVerify's customers:

> We also cannot assure you that our customers will continue to use our solutions available on these digital media platforms. Some of our integration partners have developed products that compete with us and we cannot assure you that other partners will not also develop competing products in the future. ***If our customers stopped using our solutions on these digital media platforms or if our integration partners decide to cease integrating our solutions, our business, financial condition and results of operations could be adversely affected***.

29.     On the same day the Q3 2023 Earnings Report was issued, the Company hosted an earnings call (the "Q3 2023 Call"). During the Q3 2023 Call, Defendant Zagorski stated that:

In programmatic, *we continue to ensure that our advertiser customers have access to all of our pre-bid verification solutions anywhere they buy media by scaling our activation solutions across emerging demand side platforms*. In the quarter, we launched a new DSP integration with LoopMe and expanded pre-bid solutions on Zeta Global, DeepIntent, Basis, Comcast-Beeswax and Criteo's Commerce Max DSPs, *widening the distribution of our industry-leading activation solutions*.

30.    On November 14, 2023, Defendant Zagorski and Defendant Allais participated in the RBC Capital Markets Global Technology, Internet, Media, Telecommunications Conference (the "November 2023 Call"). In response to a question about DoubleVerify's outlook for 2024, Defendant Zagorski stated:

When we look at 2024, the new story, there is the news feed, right? So currently on Meta – on Facebook, we do what's called invalid traffic analysis and viewability analysis on the news feed, where arguably almost all the traffic goes. We are testing right now brand safety and suitability measurement on the news feed, and we expect to launch that sometime in early 2024. *That will provide significant growth opportunities for us moving ahead as we expand that to an entirely new customer base and expand with our current customers across that*.

And when we launch on news feed, we'll also be launching brand safety and suitability across Instagram and across the reel – of Facebook reels as well. So we've got lots of different catalysts pushing social ahead and I think, the last thing I'll note there is you also have macro environment changes with regard to cookie deprecation and more – more advertisers looking to be able to close the loop, which lends them to walled gardens and social.

31.    During the November 2023 Call, in response to a question about DoubleVerify's growth opportunities, Defendant Zagorski stated:

We look at retail media as being a driver of all three of our revenue lines. So, we report on what's called Activation, which is pre-bid revenue, Measurement, which is post-bid or after the ads been purchased and then platform revenue, which is we kind of take our products and sell them base versions of them to platforms to filter their inventory. Retail media has helped drive all of those, so think of it as we designate certain types of transactions in each of those three line items as retail media transactions. *Last quarter, we saw 75% growth across those lines*. And we work with folks like Amazon, Walmart, Macy's, Target, BestBuy. Everyone has a retail media network these days. Dollar General has one now, in case you're in the Dollar store business.

So, I think it's an interesting opportunity for us for growth because as we noted earlier, *as cookies start to get deprecated in the open market, these retail media*

*networks provide an interesting opportunity for advertisers to look to close the loop by taking first party data from retailers using that, if you're an OEM to target advertisers outside of that, that website. So, it creates new opportunity there*.

32.     On December 4, 2023, Defendant Zagorski and Defendant Allais participated in the Raymond James Technology and Consumer Conference (the "December 2023 Call"). During the conference, Defendant Zagorski stated that "*We ensure that the ad spend is delivered in a safe effective manner to the real person in a real safe digital marketing platform*." Defendant Zagorski was also asked about DoubleVerify's Activation Services revenue:

Q: Andrew Marok, Raymond James: Let's shift to activation. So, authentic brand suitability or ABS kind of remained an important revenue contributor to the segment, up 40% year-over-year, kind of building on years of ramp. What's driving the growth for that product specifically and expectations on sustainability of current growth rates for ABS?

A: Defendant Zagorski: Yeah. ABS is a wonderful solution for us. It's over five years old. And as you noted, it grew 40% last quarter for a five-year-old product and not on small numbers, on big numbers. I think ABS is a great example of how our products have progressed from being protection to helping drive performance.

Going back to how we started this conversation, ABS is a pre-filtering solution for programmatic. So, it's integrated into places like The Trade Desk and Google's DV 360. Allows advertisers to turn that knob very finely on a campaign-by-campaign basis to filter out impressions, not even bid on impressions that don't make sense for them, right? So, rather than try to block something that I already bought or report back to me if there is a violation, keep me from buying it in the first place. And that's what ABS does. *And when we look at the growth drivers, that 40% growth, 85% of it came from current customers, right*? I think it's 85%. Yeah. I'm looking, I'm looking, I am the person, just make sure I get the number right.

*So, it's current customer growth*. And to me, that is awesome, because that shows that people who are using it today know it works. And not just because it protects them, but is helping to drive performance, right? They're taking bad stuff out of the system. *And in programmatic, you can see what works really instantly. So, if it wasn't working and it's a premium price product, let me charge almost 2.5 times more for that solution than we do for some of our measurement solutions. So, people are paying more for it. They're using it more. And it's still growing after five years means it works. It's driving performance*.

So, we're excited about ABS. It continues to grow. Brands continue to launch it in new markets, across new lines of business. And it's a solution that I think is unparalleled in the industry. ***There's no comparative solution***.

33.     During the December 2023 Call, Defendant Allais was also asked about

DoubleVerify's expanded Activation Services across additional walled garden platforms:

It is understood that a third-party independent verifier should be available in the walled gardens. TikTok contributed a lot to that because they started saying, yes, we want verification. And once that happened, Facebook sort of had to be able to provide a similar offering on their platform.

So I think we're already there. What's – the secret sauce for us is knowing the walled garden space, right, because every time there's an integration, you really need to understand how it works, specifically for each walled garden out there. ***And that's the part where I think years of us having worked with them makes it very easy for us to continue our coverage whenever a new volume becomes available. But we're kind of already at the stage where it is understood that verification should be available in the walled gardens***.

34.     On January 17, 2024, Defendant Zagorski and Defendant Allais participated in the

Needham Growth Conference (the "January 2024 Call").  Defendant Zagorski was asked about

DoubleVerify's Activation Services revenue:

Q: Laura Martin, Needham Securities: Talk about how you think – I'm going to focus on the economics, but why don't you talk about strategically across the business how you think Scibids helps overall DoubleVerify increase its market share and drive economics, which is what I actually care about?

A: Defendant Zagorski: Yeah, for sure. I mean, Scibids is a really exciting acquisition for us and it fits perfectly into our long-term strategic goals. And we're not too far in the weeds here, but ***if you think about what we do and what we call our activation business, which is over 50% of our revenue***. Activation, as Nicola noted, is the ability to filter out bad behavior, bad stuff before someone even buys it. And we do that on the pre-bid side through platforms like Trade Desk and Xandr and Google and all the big GSVs, Amazon, right?

[…]

***We have advertisers that work with our competitors for measurement are coming to us on performance tools, because our competitors don't have anything comparable***.

35.    During the January 2024 Call, Defendant Zagorski also made the following statement about DoubleVerify's relationship with walled gardens:

> ***Our relationship with walled gardens is very strong and will continue to grow***. And I think it goes back to that second thing. I said we want to make sure that we expand our presence across platforms, because wherever dollars go from an advertising perspective, we want to be there and verify it, and so that we don't get concerned about a shift from one platform to another or from one country to another. And I think that's where we want to be.

36.    The statements in ¶¶ 26-35 were materially false and misleading when made because they failed to disclose the following adverse facts that existed at the time they were made:

(a)    DoubleVerify's customers were shifting their ad spending from open exchanges to closed platforms, where the Company's technological capabilities were limited and competed directly with native tools provided by platforms like Meta Platforms and Amazon;

(b)    DoubleVerify's ability to monetize on its Activation Services was limited because the development of its technology for closed platforms was significantly more expensive and time-consuming than disclosed to investors;

(c)    DoubleVerify's Activation Services in connection with certain closed platforms would take several years to monetize;

(d)    DoubleVerify's competitors were better positioned to incorporate AI into their offerings on closed platforms, which impaired DoubleVerify's ability to compete effectively and adversely impacted the Company's profits;

(e)    DoubleVerify systematically overbilled its customers for ad impressions served to declared bots operating out of known data center server farms;

(f)    DoubleVerify's risk disclosures were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; and

(g)        as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading or lacked a reasonable basis.

**C.    The Truth Begins to Emerge While DoubleVerify Continues to Mislead Investors**

37.    Investors began to learn the truth about this fraud on February 28, 2024, when DoubleVerify lowered its first quarter 2024 revenue guidance due to "a slow start by brand advertisers and a slow ramp by recently signed new large customers."    On this news, DoubleVerify's stock price dropped $8.35 per share, or 21.3 percent, from a closing price of $39.24 on February 28, 2024, to a closing price of $30.89 on February 29, 2024.

38.    While this news partially revealed Defendants' fraud, Defendants continued to mislead investors.    On February 28, 2024, DoubleVerify issued a press release announcing its results for the fourth quarter and full year ended December 31, 2023.    In the press release, DoubleVerify touted its yearly revenue of "***$572.5 Million Driven by Global Growth in Social, CTV Measurement and Programmatic Activation***."

39.    On the same day, the Company hosted an earnings call for the fourth quarter of 2023 and the full year (the "Q4 2023 Call").    On the Q4 2023 Call, Defendant Zagorski made the following statement about DoubleVerify's Activation Services:

> In addition, we've leaned into our customer acquisition and retention plan of building higher value, more strategic customer engagements that leverage our real time data to drive superior outcomes and ROI. Over the last four years, DV has more than doubled the number of customers and revenue, while increasing our overall MTF and expanding the bundle of solutions our customers use from us. ***As media performance joins media quality protection as a core part of our superior value proposition, closed loop optimization leveraging data partnerships like we have with Attain, fueled by data insights from Scibids AI, and activated via proprietary solutions like ABS, will help us to further enhance our premium value position in the marketplace, elevate and differentiate the level of our customer engagements, and set DV up for continued future market share growth***.

40.    The same day, the Company filed with the SEC a Form 10-K reporting the

Company's financial and operational results for the year ended December 31, 2023 (the "2023 10-

K").  The 2023 10-K contained the same risk disclosures discussed in ¶¶ 27-28, *supra*.

41.    On March 6, 2024, Defendant Zagorski and Defendant Allais participated in the

KeyBanc Emerging Technology Summit.  Defendant Zagorski was asked about DoubleVerify's

Activation Services revenue:

> So, *if you look at the core fundamentals of our activation business*, *it's always
> been about trying to help an advertiser avoid certain types of content that aren't
> going to work for them, right*. Get garbage out of the system and what's left will
> work better.
>
> We started that with what we call, let's say, basic brand safety, which was a very
> stiff yes or no based on very specific criteria. Was this safe or not safe, right. ABS
> was the evolution of that. So, we say we went from static to dynamic and ABS
> allowed us to say, okay, let's create brand suitability tiers, so not just brand safety,
> but suitability on a customer by customer basis on a campaign by campaign basis.
>
> […]
>
> So, it leverages our data to do that. And *it's another way that we take core data
> points on brand safety, on suitability, on context, on viewability, on attention, and
> leverage those in a way, in a pre-bid fashion to help optimize an advertiser spend
> and help them drive more spend*.

42.    Defendant Zagorski also made the following statement about DoubleVerify's

Activation Services revenue during the KeyBanc Emerging Technology Summit:

> So, I think the opportunity is one in which we've said, multiples larger than it is
> today. It'll take time. *We have upselling to do. We still have additional volume
> and growth to go after.* And the iteration of the product that we've launched in
> brand safety on Meta is just iteration one, that's important to know.
>
> Any product that we launch across a walled garden usually starts with a basic
> version and then ends up in a much more granular detail version down the road as
> we move into areas like brand suitability, more granularity and reporting back on
> suitability violations and etcetera.

43.    On March 7, 2024, Defendant Zagorski and Defendant Allais participated in the Morgan Stanley Technology, Media & Telecom Conference.  Defendant Allais made the following statement about DoubleVerify's Activation Services revenue:

> The drivers of the growth that we see right now, social is only on the measurement side right now, right. So, the walled gardens where the walled gardens are providing a level of brand safety that we can then measure for our advertisers. So, **social is a measurement that is the area that we see the most growth in the short term**. I'm sure we'll talk about Meta and brand safety, brand suitability, that's the driver. Pre-bid, we have premium-priced products there that are unique in the market that are continuing to create a lot of growth for us. So ABS, which Mark really mentioned is premium-priced product. **Two thirds of the growth that we saw last quarter was from existing customers continuing to use our service on more and more impressions, that's a five-year-old product. So, we have a lot of drivers. I think short term, social is really where we see this huge growth**.

44.    On May 7, 2024, in connection with its first quarter 2024 earnings report, DoubleVerify surprised analysts by cutting its full-year 2024 revenue outlook due to customers that were pulling back on their ad spending.  On this news, DoubleVerify's stock price dropped $11.79 per share, or 38.6 percent, from a closing price of $30.57 on May 7, 2024 to a closing price of $18.78 on May 8, 2024.

45.    While this news further revealed Defendants' fraud, DoubleVerify continued to mislead investors.  On the same day, the Company issued a press release announcing its results for the first quarter ended March 31, 2024 and disclosed quarterly revenue of $140.8 million.  In the press release, Defendant Zagorski was quoted as stating that "**We enhanced and scaled our independently accredited core verification and performance solutions across leading social and CTV platforms**, grew the adoption and usage of Scibids AI, and expanded our international businesses through global partnerships with large new and existing advertisers, all of which **drove strong revenue growth and profitability**."

16

46.    On the same day, the Company hosted an earnings call for the first quarter of 2024

(the "Q1 2024 Call").  In the prepared remarks portion of the Q1 2024 Call, Defendant Zagorski

made the following statement about DoubleVerify's Activation Services:

> To conclude, we are witnessing strong growth in digital video, including CTV, social video and online video. We see this growth characterized by increasing ad spend on social video and CTV, which is primarily acquired through private marketplace for Programmatic Guaranteed and direct deals. *For advertisers, this has meant navigating through more closed ecosystem, leading to greater fragmentation, complexity and challenges in implementing scalable strategies, interpreting data, evaluating performance and establishing trust across various networks*.

> Strong, independent verification of closed ecosystem is essential to maintaining accountability and sustaining buyer confidence. DV has extensive experience in harnessing the power of AI, machine learning, and data science, as well as building trusted, scalable solutions integrated across all platforms, whether open or closed. We measure data that correlates with the business outcomes advertisers aim to achieve, and we can activate that measurement data to help advertisers drive better outcomes.

47.    On May 20, 2024, Defendant Zagorski and Defendant Allais participated in the J.P.

Morgan Global Technology, Media and Communications Conference.  Defendant Allais made the

following statement about DoubleVerify's Activation Services revenue:

> If you think about it, even at the level of a specific product, if we take ABS, for example, which is our premium priced product on the activation side, only 60% of our top 500 clients use it. So that means there's an opportunity, even within our base, to continue to have more customers using it. And even within the base of customers that use it, this is the part that's hard to evaluate. But even within the piece of the pie that uses our product, there's probably another 40% or 50% of the business that still don't use ABS. So not only do we have customers that don't use it yet, but even the ones that use it don't necessarily use it on all their volumes. . . . They may have other brands, it might take time to get to certain geographies. So *the opportunity to continue to penetrate there is pretty high for us*.

48.    During the same conference, Defendant Zagorski made the following statement

about the effectiveness of DoubleVerify's fraud detection techniques:

> When we do things like brand suitability measurement, we do so at a much more granular level than any other platform out there. We have more tiers of suitability and more levels of sensitivity than anybody else, which allows us to measure more

granularly. On the fraud side, because we use deterministic fraud techniques and have our own Fraud Lab, which was the first in the industry, and I think it's pretty much the only one that's really at scale out there, *we're able to identify fraud 8.5 times more effectively and efficiency than our competitors*.

49.    During the same conference, Defendant Zagorski was asked about DoubleVerify's

Activation Services revenue:

Q: Mark R. Murphy, J.P.Morgan: Let me ask you one more, because I think this could be a great note to end on. What are your aspirations in social? What I mean by that is if you look at the market share that you could have in social and then you compare it to what your market share is very strong, very robust in your kind of pre-existing markets, is there any way to think that through or even just to think about how much of the social kind of walled garden inventory they would expose to you? Like, where could this be in 5 or 10 years?

A: Defendant Zagorski: I mean, look, if you look at digital ad spend, something like 70% of it is social. Right now, 17% of our revenue is social. So we would like our business at some point to look like the ad spend business. If we're verifying everywhere, then *we see a significant amount of upside coming from social. And I think we're just scratching the surface there*.

50.    On June 4, 2024, Defendant Zagorski and Defendant Allais participated in the Baird

Global Consumer, Technology & Services Conference.  Defendant Zagorski made the following

statement about DoubleVerify's Activation Services revenue:

When we look at social, for example, our monetization is very heavily focused on measurement today, right? So the measurement, the post-bid side of that business. But I think *there's opportunities for us to grow our activation business across social down the road*. We have a prescreen solution in market now for YouTube, which continues to grow and allows us to again make money on both the prescreen and the measurement parts of YouTube.

*We've got activation solutions now via our Scibids implementation across social networks that are just being launched. So we've got activation opportunities there too*. So I think right now when we look at social, it's very heavily measurement focused with *significant activation opportunities down the road as we build more tools and as we penetrate more platforms*. When we look at CTV, it's a matter of we do both pre-bid and post-bid for CTV. I think there the monetization really has to do more with pricing versus penetration and product.

51.    On July 30, 2024, DoubleVerify issued a press release announcing its results for

the second quarter ended June 30, 2024 and disclosed quarterly revenue of $155.9 million.  In the

press release, DoubleVerify touted its "***strong performance was driven by multiple products across activation, measurement, and supply-side revenue that leveraged growth across social, CTV, and retail media environments***."

52.    On the same day, the Company hosted an earnings call for the second quarter of 2024 (the "Q2 2024 Call").  In the prepared remarks portion of the Q2 2023 Call, Defendant Zagorski made the following statement about DoubleVerify's Activation Services:

> As video content, whether short form, long form or CTV, becomes the primary way that consumers engage with the Internet and advertisers reach consumers, ***DV has developed the industry's most effective and cost-efficient solutions to verify that those video ad interactions are viewable, secure and suitable, positioning us perfectly to continue to further capitalize on this trend***. Moreover, with digital ad spend outside the United States growing at nearly double the rate of domestic growth per Magna Global, DV has invested in more global resources than any other company in our sector, positioning us to take full advantage of this trend. Building on these achievements, ***our accelerated momentum is evident in numerous our RFPs we won in the first half of the year and in an enterprise deal pipeline that has never been stronger with greenfield and competitive opportunities set to fuel our resurgent measurement and leading activation businesses for the next several quarters***.

> […]

> Based on our unmatched scale and differentiated solution set, we are also seizing a prime opportunity to gain market share and extend our industry leadership. With Oracle shutting down operations of Moat and Grapeshot on September 30, we've already attracted interest from many of their advertiser and platform customers who recognize DoubleVerify's differentiated, best-in-class capabilities across social activation, Scibids, CTV and retail media. ***While we anticipate closing many of these opportunities by yearend, the revenue impact will really kick in early 2025 due to the time required for onboarding and ramp-up. Moreover, we expect these customers to grow well beyond 2025 as we typically up-sell from measurement to activation between the first and third years of new contracts***.

53.    On the same day, the Company filed its earnings results for the second quarter of 2023 (the "Q2 2024 Call").  In the Q2 2024 10-Q, the Company stated that "There have been no material changes to the risk factors described in the section titled 'Risk Factors' in the [2023 10K]." The 2023 10-K contained the same risk disclosures discussed in ¶¶ 27-28, *supra*.

54. On September 10, 2024, Defendant Zagorski and Defendant Allais participated in the Piper Sandler Growth Frontiers Conference. Defendant Allais made the following statement about DoubleVerify's Activation Services revenue:

The way we help advertisers is both on the measurement side of the business, which is an ad runs and then we tell the advertiser how it did based on the criterias that we have. But we also help the advertiser now more and more on the activation side of the business, which is even before you bid on an ad, can you use our data to inform whether you're about to bid on a good placement or a bad placement? And so, we have measurement and activation, that's 90% of our revenue.

***The drivers of the growth on activation, which is the larger part of our revenue, it was a double-digit growth in Q2. What's happened recently is we've been able to open up activation for social. So, this is a new trend where we've been able to do activation for the open web for a long time, but now we're starting to do it on the social side. And that's been one of the drivers of the growth on the activation side***. We think it's long-term growth drivers, where we'll be able to replicate the success we've had with the open web with the social platform. And that business grew 12% in the quarter.

55. On September 12, 2024, Defendant Zagorski and Defendant Allais participated in the Goldman Sachs Communacopia Technology Conference. Defendant Allais was asked about execution hurdles for DoubleVerify's Activation Services revenue:

Unlike the open web, it's going to be an integration platform by platform. So that alone tells you it's going to take a bit of time. **The good news for us** is we already have this for YouTube. We have a product in the market. It's a prescreen tool. It already exists on YouTube. ***We've been in market with this for several years. So we know what the model looks like. We know what the data is that we need. We need to replicate that with every other platform. Your question is the timing.***

[…]

The timing is depending on the platforms wanting to kind of get there and understanding the power of the tool. So it's a business development effort, the technology, and the knowhow. We know how to do it on YouTube. So it'll take a little bit of time to understand how each platform is different, but it's really about when the platform is ready to work on it. So we're working with three platforms. The big one will be Meta, and since they just launched, the measurement side, ***it is going to take a little bit of time from business development to kind of get there***.

56.    On November 6, 2024, DoubleVerify issued a press release announcing its results for the second quarter ended September 30, 2024 and reported quarterly revenue of $169.6 million. In the press release, DoubleVerify touted its "***Double-Digit Growth Across All Revenue Lines as Advertisers and Platforms Expand Adoption of DV's Solutions***."

57.    The same day, the Company hosted an earnings call for the quarter (the "Q3 2024 Call").  During the Q3 2024 Call, Defendant Zagorski reiterated that:

> This year, ***the industry shift towards outcome-driven platforms, especially those in social media, has accelerated the demand for performance-based solutions***. Make no mistake, real performance starts with protection. Without it, ad spend is wasted on fraudulent, non-viewable impressions or placements that don't align with brand objectives. ***DV is uniquely positioned to integrate protection and media quality requirements with performance and media efficacy objectives***, creating powerful solutions that today's advertisers demand. While this transition may have a near-term impact on core growth, ***as we unified protection with performance on social media, our innovative solutions, including DV Authentic Attention and Scibids AI, continue to gain momentum to support long-term growth***.

58.    On the same day, the Company filed its earnings results for the third quarter of 2023 (the "Q3 2024 Call").  In the Q3 2024 10-Q, the Company stated that "There have been no material changes to the risk factors described in the section titled 'Risk Factors' in the [2023 10K]."  The 2023 10-K contained the same risk disclosures discussed in ¶¶ 27-28, *supra*.

59.    The statements in ¶¶ 38-43 and 45-58 were materially false and misleading when made because they failed to disclose the following adverse facts:

(a)    DoubleVerify's customers were shifting their ad spending from open exchanges to closed platforms, where the Company's technological capabilities were limited and competed directly with native tools provided by platforms like Meta Platforms and Amazon;

(b)    DoubleVerify's ability to monetize on its Activation Services was limited because the development of its technology for closed platforms was significantly more expensive and time-consuming than disclosed to investors;

(c)      DoubleVerify's Activation Services in connection with certain closed platforms would take several years to monetize;

(d)      DoubleVerify's competitors were better positioned to incorporate AI into their offerings on closed platforms, which impaired DoubleVerify's ability to compete effectively and adversely impacted the Company's profits;

(e)      DoubleVerify systematically overbilled its customers for ad impressions served to declared bots operating out of known data center server farms;

(f)      DoubleVerify's risk disclosures were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; and

(g)      as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading or lacked a reasonable basis.

**D.     The Truth Is Fully Revealed**

60.     Defendants' fraud was further revealed on February 27, 2025, when DoubleVerify reported lower-than-expected fourth quarter 2024 sales and earnings due in part to reduced customer spending and the suspension of DoubleVerify services by a large customer.  Defendants also disclosed that the shift of ad dollars from open exchanges to closed platforms was negatively impacting the Company.

61.     In prepared remarks on a conference call to discuss quarterly earnings ("Q4 2024 Earnings Call"), Defendant Zagorski stated:

> Throughout the year, we navigated some isolated headwinds, **including scaled back ad spend from six large customers. And in Q4, one of our largest customers facing billions of dollars of sharply escalating commodity costs, dramatically reduced its spend with DV as part of a sweeping cost reduction initiative that also impacted their other advertising and marketing partners**. Although this customer has maintained limited engagement with DV while temporarily shifting to standard native tools within each tech platform, we have

completely excluded them from our 2025 guidance to provide a realistic outlook for the year ahead. These factors, combined with the absence of a post-election rebound in ad spend, resulted in a disappointing Q4 that fell short of our expectations.

Beyond these isolated customer challenges, **we also saw the continued shift of ad dollars from open web, programmatic to proprietary platforms like social, where most of our activation solutions were unavailable until early this year**. And spending in private marketplaces, PMPs, and direct programmatic guarantee deals, or PG, also started to accelerate temporarily limiting advertiser's ability to attach DV solutions to every transaction.

62.    During the Q4 2024 Earnings Call, Defendant Allais stated:

In terms of opportunities, our guidance accounts for moderate growth in new social revenue, factoring in time for clients to test and onboard a newly launched social activation solution, a **one- to three-year period to upsell our premium solutions** to the Moat clients that we on-boarded in Q4 2024, and a measured in-year revenue upside from Rockerbox as we prioritize the integration of product and operations in 2025.

63.    On this news, DoubleVerify's stock price dropped $7.83 per share, or 36.0 percent, from a closing price of $21.73 on February 27, 2025 to a closing price of $13.90 on February 28, 2025.

64.    Analysts were shocked by the news.  For example, analysts at Truist Securities noted that DoubleVerify's revenue suffered from "more ad spend going towards private marketplace and programmatic guaranteed on proprietary platforms (i.e. walled-gardens, particularly social) at the expense of the open web."  Analysts at Goldman Sachs downgraded their rating and lowered the price target from $24 to $20, noting "a slower upsell environment from new customer wins."

65.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## POST CLASS PERIOD EVENTS

66.     On March 28, 2025, data analysis and market research company Adalytics released a report claiming that DoubleVerify's web advertisement verification and fraud protection services are ineffective, and that DoubleVerify customers are regularly billed for ad impressions served to declared bots operating out of known data center server farms.

67.     On the same day, *The Wall Street Journal* reported that DoubleVerify regularly misses detection of nonhuman traffic in contradiction to the Company's claims that it helps brands avoid serving ads to nonhuman bot accounts.  In response, U.S. Senator Mark Warner wrote to the Federal Trade Commission Chairman and to the U.S. Department of Justice expressing concern over claims that the Company has been systematically overcharging its customers.

## ADDITIONAL SCIENTER ALLEGATIONS

68.     During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

69.     The Individual Defendants permitted DoubleVerify to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's securities.

70.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding DoubleVerify, their control over, receipt, or modification of DoubleVerify's allegedly materially misleading statements and omissions, or their

positions with the Company that made them privy to confidential information concerning DoubleVerify, participated in the fraudulent scheme alleged herein.

71.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of DoubleVerify common stock by disseminating materially false and misleading statements or concealing material adverse facts. The scheme deceived the investing public regarding DoubleVerify's business, operations, and management and the intrinsic value of DoubleVerify stock and caused Plaintiff and members of the Class to purchase DoubleVerify stock at artificially inflated prices.

## LOSS CAUSATION/ECONOMIC LOSS

72.    During the Class Period, as detailed herein, DoubleVerify and the Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of DoubleVerify stock and operated as a fraud or deceit on Class Period purchasers of DoubleVerify stock by misrepresenting the Company's business and prospects.  Later, when Defendants' prior misrepresentations and fraudulent conduct became known to the market, the price of DoubleVerify stock declined as the prior artificial inflation came out of the price over time.  As a result of their purchases of DoubleVerify stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

**A.    Applicability of Presumption of Reliance: Fraud on the Market**

73.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Plaintiff and other members of the Class purchased DoubleVerify stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

74.    At all relevant times, the markets for DoubleVerify stock was efficient for the following reasons, among others:

(a)    as a regulated issuer, DoubleVerify filed periodic public reports with the SEC;

(b)    DoubleVerify regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)    DoubleVerify was followed by numerous securities analysts employed by a major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)    DoubleVerify stock was actively traded in an efficient market, including its common stock that was traded on the NYSE under the ticker symbol "DV."

75.    As a result of the foregoing, the market for DoubleVerify stock promptly digested current information regarding DoubleVerify from publicly available sources and reflected such information in DoubleVerify's stock prices.   Under these circumstances, all purchasers of

DoubleVerify stock during the Class Period suffered similar injury through their purchase of DoubleVerify stock at artificially inflated prices and the presumption of reliance applies.

76.     Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff and the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

**B.      No Safe Harbor**

77.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of DoubleVerify who knew that the statement was false when made.

**CLASS ACTION ALLEGATIONS**

(a)     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired DoubleVerify common stock during the Class Period and were damaged upon the

revelation of the alleged corrective disclosure. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

78.     The members of the Class are so numerous that joinder is impracticable. DoubleVerify common stock is actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes there are hundreds, if not thousands, of members in the Class. Record owners and other Class members may be identified from records procured from or maintained by the Company or its transfer agent and may be notified of the pendency of this action using a form of notice similar to that customarily used in securities class actions.

79.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

80.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

81.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including:

> (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of DoubleVerify;

(c)     whether the Individual Defendants caused DoubleVerify to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of DoubleVerify common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

82.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the wrongs alleged. There will be no difficulty in managing this action as a class action.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against DoubleVerify and the Individual Defendants**

83.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

84.     During the Class Period, the Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that

they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

85.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of DoubleVerify stock during the Class Period.

86.    Plaintiff and Class members have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for DoubleVerify stock. Plaintiff and Class members would not have purchased DoubleVerify stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

87.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of DoubleVerify stock during the Class Period.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

88.    Plaintiff repeats and realleges the allegations contained in ¶¶ 1-87 as if fully set forth herein.

89.    The Individual Defendants acted as controlling persons of DoubleVerify within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions and their power to

control the actions of DoubleVerify and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

<strong>PRAYER FOR RELIEF</strong>

WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, respectfully prays for judgment against defendants as follows:

(A)    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(B)    Awarding Plaintiff and the Class compensatory damages against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

(C)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

(D)    Granting such other, further, and/or different relief as the Court deems just and proper.

<strong>JURY DEMAND</strong>

Plaintiff demands a trial by jury.

DATED: May 22, 2025

**LABATON KELLER SUCHAROW LLP**

/s/ Francis P. McConville
Francis P. McConville
Connor C. Boehme
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
fmcconville@labaton.com
cboehme@labaton.com

*Counsel for Plaintiff*

## **CERTIFICATION**

I, Michael P. Donovan, as Administrator of Electrical Workers Pension Fund, Local 103, I.B.E.W. ("Local 103"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Local 103. I have reviewed a complaint prepared against DoubleVerify Holdings, Inc. ("DoubleVerify") alleging violations of the federal securities laws, and authorize the filing of this pleading;

2.      Local 103 did not purchase DoubleVerify common stock at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Local 103 is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary. Local 103 fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.      Local 103's transactions in DoubleVerify common stock during the Class Period are reflected in Exhibit A, attached hereto;

5.      Local 103 has not sought to serve as a lead plaintiff or representative party in any class actions filed under the federal securities laws during the last three years;

6.      Beyond its pro rata share of any recovery, Local 103 will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this *21* day of May, 2025.

Michael P. Donovan
Administrator
Electrical Workers Pension Fund, Local 103,
I.B.E.W.

**EXHIBIT A**

**TRANSACTIONS IN DOUBLEVERIFY HOLDINGS, INC.**

| Transaction Type | Trade Date | Shares | Share Price | Cost/Proceeds |
|---|---|---|---|---|
| Purchases | 04/19/2024 | 11,809 | $30.0390 | ($354,730.55) |